**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MLCSV10, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-4186 |
| | § | |
| STATESIDE ENTERPRISES, INC., | § | |
| | § | |
| Consol Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| HARTFORD STEAM BOILER | § | |
| INSPECTION AND INSURANCE | § | |
| COMPANY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is one of the many insurance cases filed in or removed to the Southern District of Texas

after Hurricane Ike.  The plaintiffs, MLCSV10 and Stateside Enterprises, Inc., sued five insurance

companies in two separate actions in state court, asserting causes of action for breach of an insurance

contract, breach of the duty of good faith and fair dealing, violations of the Texas Insurance Code

("TIC"), and violations of the Texas Deceptive Trade Practices Act ("DTPA").  The plaintiffs

alleged that the defendants underpaid two insurance claims under a commercial lines policy that one

of the defendants, the Massachusetts Bay Insurance Company, issued to Stateside.  The insurance

claims sought to recover the cost of repairing damage from the hurricane and from vandalism to the

Deerbrook Crossing Shopping Center, a commercial property that Stateside owned and that

MLCSV10 now owns.  The defendants removed the two actions to federal court, where they have been consolidated.

Before suing, the plaintiffs invoked appraisal under the Massachusetts Bay policy.  While the consolidated case was pending in this court, the appraisal panel issued its award.  The defendants have moved for summary judgment on all claims based on their tendering full payment of the amount the appraisal panel awarded.  (Docket Entry No. 33.)  Stateside and MLCSV10 oppose the motion, arguing that there are disputed fact issues material to determining whether the appraisal award should be disregarded.  (Docket Entries No. 34 & 41.)  Stateside and MLCSV10 contend that the summary judgment record shows that the appraisal panel was not impartial because of a business-referral relationship between the companies for which the umpire and the appraiser selected by the defendants worked.  Stateside and MLCSV10 also contend that the award resulted from accident or mistake because it was not based on a sound, reasonable, or reliable methodology for assessing the loss amount.  Finally, Stateside and MLCSV10 contend that the appraisal panel exceeded its authority by deciding causation and coverage issues reserved for the court.

The court heard oral argument on the summary judgment motion.  Based on the pleadings; the motion, responses, and replies; the record; the arguments of counsel; and the relevant law, this court grants in part and denies in part the defendants' motion for summary judgment.  The reasons for these rulings are explained below.

A status conference to set a schedule to resolve the remaining claims is set for **April 16, 2012  at 5:00 p.m.**

## I.    Background[1]

Massachusetts Bay issued Stateside a commercial lines policy (the "Policy") for the Deerbrook Crossing Shopping Center (the "Property"), with coverage from August 2008 to August 2009.  The Policy contained the following appraisal provision:

> If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser and notify the other of the appraiser selected within 20 days of such demand.  The two appraisers will select an umpire.  If they cannot agree within 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction.  Each appraiser will state the amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding as to the amount of loss.  Each party will:
>
> a.    Pay its chosen appraiser; and
> b.    Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal:
>
> a.    You will still retain your right to bring a legal action against us, subject to the provisions of the Legal Action Against Us Commercial Property Condition; and
> b.    We will still retain our right to deny the claim.

(Docket Entry No. 33-4, at 44.)

In September 2008, Stateside submitted a claim under the Policy to Massachusetts Bay for damage to the Property caused by Hurricane Ike.  While the insurer's adjuster was investigating the claim, Stateside submitted a separate claim for vandalism-related damage to the Property's rooftop HVAC units.  Massachusetts Bay paid $219,529.27 for the hurricane-damage claim and $50,000.00

---

[1]  The background is drawn from the pleadings and the summary judgment record, which, among other things, includes: (1) the Massachusetts Bay policy; (2) the deposition of Brian Haden; (3) the deposition of Brett Lochridge; (4) the deposition of Chuck McCool; (5) Haden's postdeposition affidavit; (6) the appraisal award; (7) a settlement agreement between Stateside and MLCSV10; and (8) various reports prepared by contractors Stateside retained to assess the damage to the shopping center.

for the vandalism-damage claim.  Dissatisfied with the amounts, Stateside invoked appraisal under the Policy in March 2009.  Stateside appointed Brian Haden as its appraiser, and Massachusetts Bay appointed Brett Lochridge.  At Haden's recommendation, the two appraisers selected Chuck McCool as umpire.

McCool was a national general adjuster for VeriClaim, an international independent adjusting firm.  Lochridge was the president of Unified Building Sciences ("UBS"), a national construction-consulting firm.  Before the appraisal in this case, VeriClaim and UBS had worked on some of the same projects and VeriClaim had on occasion recommended that its clients hire UBS. McCool and Lochridge testified that they disclosed the extent of the VeriClaim-UBS relationship to Haden at the beginning of the appraisal process.  Haden contradicted that testimony.  It is undisputed that although McCool and Lochridge had met once before they began working on the appraisal in this case, they had not previously worked together.  There is no evidence in the record that McCool referred clients to Lochridge or that Lochridge referred clients to McCool.

While the appraisal was underway, MLCSV10 purchased the Property and entered into a Settlement Agreement with Stateside.  Under the Settlement Agreement, MLCSV10 obtained "the exclusive right" to prosecute "Policy-Based Claims," defined as "those contractual claims for damages . . . related to the Losses . . . covered by the Policy."  (Docket Entry No. 33-10, at 2.) Stateside retained the "exclusive right" to prosecute "Bad Faith Claims."  (*Id.* at 3.)  The Settlement Agreement defined "Bad Faith Claims" as "those extra-contractual claims for damages . . . that arise from the Insurer's claims settlement practices," including claims for breach of the duty of good faith and fair dealing and claims under the TIC and the DTPA.  (*Id.* at 2.)

4

In September 2010, during the appraisal process, MLCSV10 filed a state-court suit against the Massachusetts Bay, the Hanover Lloyd's Insurance Company, the Hanover Insurance Company, the Hanover American Insurance Company, and the Hartford Steam Boiler Inspection and Insurance Company.   MLCSV10 asserted a breach of contract claim for Massachusetts Bay's alleged underpayment under the Policy.   Stateside filed a state-court suit against the same defendants, asserting, in addition to breach of contract, causes of action for breach of the duty of good faith and fair dealing and violations of the TIC and DTPA.   The defendants timely removed to federal court, where the two suits were consolidated.

In May 2011, Stateside filed a third amended complaint, dropping the breach of contract claim but continuing to assert extracontractual claims against Massachusetts Bay and Hartford. After Stateside filed its third amended complaint, both plaintiffs dismissed their claims against Hartford.  The remaining claims are Stateside's extracontractual claims against Massachusetts Bay and MLCSV10's breach of contract claim against Massachusetts Bay and the three Hanover insurance companies.[2]

In February 2011, the appraisal award was issued to Stateside.   The award was for $784,311.39 for the Hurricane Ike claim and $185,815.67 for the vandalism claim.  Haden refused to sign the appraisal award.  In his deposition, Haden testified that he disagreed with the appraised amounts for repairing: (1) the damage to Roof A; (2) the damage caused by the vandalism of the rooftop HVAC units; and (3) the CMU block damage.  Haden testified that he disputed McCool's incorporation of Lochridge's estimates rather than Haden's to arrive at the appraisal amounts for

---

[2]  At the scheduling conference held on March 25, 2011, MLCSV10 stated that it would dismiss the three Hanover insurance companies from the case.  MLCSV10 has not done so.  It is unclear how the Hanover defendants are connected to the breach of contract claim or under what theory they may be liable for breaching the policy that Massachusetts Bay issued.

these categories of damage.  One reason for Haden's disagreement was that he had submitted various contractors' reports to support his numbers and Lochridge had not.

After subtracting the Policy deductible and the previous payments, Massachusetts Bay tendered two checks: (1) $540,732.17 for the Hurricane Ike claim; and (2) $85,815.67 for the vandalism claim.  MLCSV10 deposited these checks into the registry of the court.  The defendants have moved for summary judgment on all claims based on full payment under the appraisal award. Massachusetts Bay argues that under Texas law, an insurer is not liable for breach of contract when it pays the amount awarded in appraisal.   The Hanover defendants argue that they are not liable for breach of contract because it was Massachusetts Bay that insured Stateside against property damage to the shopping center.  All defendants contend that because there is no breach of contract, the extracontractual claims fail as a matter of law.

The plaintiffs respond that summary judgment is improper because there are disputed fact issues material to determining whether the appraisal award is valid or whether it should be disregarded and set aside.  The plaintiffs contend that Lochridge and McCool "failed to disclose a referral relationship between each others' companies, thereby implicating the impartiality of the tribunal and violating the terms of the policy's appraisal provision"; that the award was the result of accident or mistake because it was not based on a sound, reasonable, or reliable methodology for assessing the loss amount; and that McCool and Lochridge determined coverage and causation issues, "thereby conducting the appraisal in excess of authority and in contravention of the policy's appraisal provision."  (Docket Entry No. 34, at 9–10.)

The parties' arguments are analyzed below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d

at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III.   Analysis

### A.     The Appraisal Award

Under Texas law, "'appraisal awards made pursuant to the provisions of an insurance contract are binding and enforceable, and every reasonable presumption will be indulged to sustain [them].'"  *JM Walker LLC v. Acadia Ins. Co.*, 356 F. App'x 744, 746 (5th Cir. 2009) (quoting *Franco v. Slavonic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 786 (Tex. App.—Houston 2004, no pet.)).  An appraisal award "estop[s] one party from contesting the issue of damages in a suit on the insurance contract, leaving only the question of liability for the court."  *Lundstrom v. United Servs. Auto. Ass'n-CIC*, 192 S.W.3d 78, 87 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).  "Because a court indulges every reasonable presumption to sustain an appraisal award, the burden of proof is on the party seeking to avoid the award."  *Id.*  Texas courts recognize "three situations in which the results of an otherwise binding appraisal may be disregarded: (1) when the award was made without authority; (2) when the award was made as a result of fraud, accident, or mistake; or (3) when the award was not in compliance with the requirements of the policy."  *Id.*  Stateside and MLCSV10 argue that all of the exceptions for disregarding an appraisal award apply.

### 1.     Was the Award in Compliance with Policy Requirements?

The Policy's appraisal provision states that if the parties disagree on the loss amount, "each party will select a competent and impartial appraiser."  (Docket Entry No. 33-4, at 44.)  The plaintiffs contend that McCool and Lochridge were not "impartial" because there was a business-referral relationship between their companies, VeriClaim and UBS.  They also contend that McCool's and Lochridge's failure to disclose this relationship to Haden created "an appearance of partiality" that provides a sufficient basis under Texas law for disregarding the award.  Contrary to the plaintiffs' argument, the summary judgment record does not support an inference that McCool and Lochridge were biased.  Nor does Texas law provide a basis for disregarding an appraisal award simply because appraisers did not disclose a preexisting relationship of the type at issue here between their employers.

Texas courts have held that "[t]he showing of a pre-existing relationship, without more, does not support a finding of bias."  *Franco*, 154 S.W.3d at 786.  In this case, the summary judgment record reveals, at most, that VeriClaim—an international independent adjusting firm—referred some clients to UBS—a national construction-consulting firm—and that VeriClaim and UBS had previously worked together on some projects.  But there is no evidence that McCool referred clients to Lochridge; that Massachusetts Bay influenced or exercised control over McCool or Lochridge during the appraisal; that McCool or Lochridge had a financial interest in the outcome of the appraisal; or that McCool was more likely to side with Lochridge than Haden because of VeriClaim's preexisting business relationship with UBS.  On this record, the plaintiffs cannot defeat summary judgment by arguing that McCool and Lochridge were "biased" against Stateside.

This result is consistent with Texas cases discussing "the quantum of evidence necessary to defeat summary judgment based on the preclusive effect of an appraisal award."  *Gardner v. State*

9

*Farm Lloyds*, 76 S.W.3d 140, 143 (Tex. App.—Houston [1st Dist.] 2002, no pet.).  In *Gardner*, the plaintiffs filed a claim with their homeowners' insurer, State Farm, for hail damage to the roof of their home.  76 S.W.3d at 141.  After State Farm denied the claim, the plaintiffs invoked appraisal. *Id.* at 142.  Boudreaux, State Farm's appraiser, "inspected the Gardners' roof, but did not find hail damage exceeding the amount of the policy deductible."  *Id.*  The Gardners' appraiser disagreed. The dispute was submitted to the umpire, who sided with  Boudreaux.   The umpire and Boudreaux "signed an appraisal determination which awarded the Gardners no money as a result of the storm." *Id.*  After the Gardners sued State Farm "for breach of contract, bad faith, and statutory violation claims," State Farm moved for summary judgment on the ground that "that the Gardners were estopped from pursuing their claims because there had been a valid presuit appraisal determination." *Id.*  The trial court "rendered summary judgment for State Farm."  *Id.*

On appeal, the Gardners argued that Boudreaux was not "independent" as required under their insurance policy because of a preexisting business relationship between State Farm and Haag Engineering Company, Boudreaux's employer.  As a result, according to the Gardners, the trial court should have disregarded the appraisal award.  *Id.* at 143.  The Gardners' evidence showed "that: (1) Haag wrote a training program used by State Farm, about hail damage claims; (2) Haag wrote numerous publications about hailstorm evaluations, and served as a 'consultant' for State Farm on those matters; and (3) Haag was paid by various State Farm companies for assignments across the United States over seven years."  *Id.*  The Texas Court of Appeals held that the summary judgment record did not raise "a fact issue about whether [Boudreaux] lacked independence."  *Id.* at 144.  The court explained that the Gardners

> presented no evidence that State Farm influenced or exercised control
> over Boudreaux.  There [was] no evidence that Boudreaux ever was

an employee of State Farm or had a financial interest in the claim. None of their evidence relate[d] to Boudreaux, the Gardners' claim, or the particular hailstorm.  Instead, their evidence involve[d] an arm's length business relationship, which [was] unrelated to [their] specific claim, between various State Farm companies and Haag.

*Id.* at 143.

In *Franco*, the plaintiff sought coverage from her insurer, Slavonic Mutual Fire Insurance Association, for the cost of repairing damage caused by a plumbing leak in her home.  154 S.W.3d at 780.  Slavonic "acknowledged Franco's claim and hired Southland Services, Inc. to inspect the premises at Franco's residence and adjust the claim."  *Id.*  After adjusting the claim, Slavonic tendered a $3,680.55 check, but Franco refused the payment and invoked appraisal.  *Id.*  Slavonic appointed Garibay as its appraiser.  *Id.* at 781.  Before this appointment, Southland had hired Garibay "to examine the premises of the Franco home and determine the cause of the damage, and Garibay [had] issued a report regarding his examination of the Franco residence and his findings."  *Id.*  Dissatisfied with the appraisal award, Franco sued Slavonic for, among other things, breach of contract.  The trial court granted summary judgment against Franco on the breach of contract claim based on Slavonic's paying the appraisal award.  *Id.* at 782–83.

On appeal, Franco argued that "the appraisal award should be set aside because Garibay was an interested, prejudiced, and biased appraiser, due to his status as an investigating engineer for Southland and the fact that he already had issued a report containing his opinions regarding the scope of [Franco's] damages and coverage prior to his appointment as appraiser."  *Id.* at 785.  The Texas Court of Appeals held that the summary judgment evidence did not raise a fact issue as to whether Garibay was biased against Franco.  *Id.* at 787.  The court explained that "Garibay was not an employee of Slavonic, and Garibay's report and conclusions regarding the cause of the plumbing

11

leak were his own." *Id.* There was "no evidence suggesting that Slavonic influenced or exercised control over Garibay, that Garibay had a financial interest in Franco's claim, or that Garibay's previous inspection of the premises somehow factored into his damages valuation." *Id.*

The evidence of bias in this case—summarized above—is certainly no stronger—if anything, it is significantly weaker—than the evidence of bias in *Gardner* or *Franco*. The summary judgment record provides no basis to set aside the appraisal award on the ground that Lochridge or McCool were biased or partial appraisers.

Stateside and MLCSV10 argue that the appraisal award may be set aside because Lochridge's and McCool's failure to disclose the business-referral relationship between their companies to Haden created an "appearance of partiality." The plaintiffs cite arbitration cases. Stateside and MLCSV10 have not cited Texas cases setting aside an appraisal award because of the appearance of partiality created by the appraiser's failure to disclose a preexisting business relationship between his employer and that of the umpire. As MLCSV10 acknowledged during oral argument, if there are Texas appraisal-award cases on point, those cases control. As discussed above, the evidence of bias in this case at most matches the evidences of bias in *Franco* and *Slavonic*. *Franco* and *Slavonic* found the relevant record evidence insufficient as a matter of law to avoid summary judgment based on the preclusive effect of the appraisal award. In the context of appraisals, Texas courts have held that "[t]he showing of a pre-existing relationship, without more, does not support a finding of bias." *Franco*, 154 S.W.3d at 786. There is no basis to conclude that assuming Lochridge and McCool did not disclose VeriClaim's past dealings with UBS to Haden—dealings that themselves are not evidence of bias—Lochridge and McCool were biased or that an appearance of partiality resulted. Texas courts require more than an appraiser's failure to

12

disclose a preexisting business relationship between the appraisers' companies to disregard an appraisal award.  Texas courts require "evidence that the [challenged] appraiser performed 'some act or conduct tending to exhibit his serving the [insurer's] interest as a partisan would.'" *Gardner*, 76 S.W.3d at 144 (quoting *Am. Cent. Ins. Co. v. Terry*, 298 S.W. 658, 662 (Tex. Civ. App.—Texarkana 1927, no writ)).  Stateside and MLCSV10 have presented no such evidence in this case.  The "appearance of partiality" argument does not preclude summary judgment.

Even assuming that Texas courts apply holdings in arbitration cases with equal force to appraisal-award cases, it is doubtful that the evidence of bias in this case satisfies the state-law standard for setting aside an arbitration award based on an arbitrator's partiality.  "[T]he Texas Legislature has decreed that—on application of a party—a court shall vacate an [arbitration] award if the rights of the party were prejudiced by evident partiality of an arbitrator appointed as a neutral arbitrator."  *Karlseng v. Cooke*, 346 S.W.3d 85, 94 (Tex. App.—Dallas 2011, no pet.) (citation omitted).  A neutral arbitrator "selected by the parties or their representatives exhibits evident partiality . . . if the arbitrator does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality." *Burlington N. R.R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 630 (Tex. 1997).  MLCSV10 asserts, without explanation, that McCool's and Lochridge's failure to disclose the VeriClaim-UBS relationship to Haden creates an appearance of partiality that requires setting aside the appraisal award.  MLCSV10 relies primarily on *TUCO*.  In that case, the Texas Supreme Court held that a "neutral arbitrator's failure to disclose his acceptance, during the course of the arbitration proceedings, of a substantial referral from the law firm of a non-neutral co-arbitrator established evident partiality as a matter of law."[3]  *Id.*  Applying the

---

[3]  The arbitration agreement in *TUCO* required each party to select a non-neutral arbitrator who "would ultimately side with the appointing party." 960 S.W.2d at 930.  The two non-neutral arbitrators would then select a third arbitrator, who "would act as the only neutral decisionmaker." *Id.*

13

evident-partiality standard, the court explained that "[a]n objective observer could . . . reasonably believe that a person in [the neutral arbitrator's] position, grateful for the referral, may have been inclined to favor [the non-neutral arbitrator's law firm] in the arbitration proceedings by siding with [the non-neutral arbitrator]." *Id.* at 637.  In this case, the alleged business-referral relationship was between VeriClaim, McCool's employer, and UBS, Lochridge's firm.  There is no evidence that UBS referred business to VeriClaim.  Without such evidence, an objective observer could not reasonably believe that McCool might have been inclined to favor UBS by selecting Lochridge's appraisal estimates over Haden's.  Nor could an objective observer reasonably believe that the business-referral relationship described might have affected Lochridge's partiality.  VeriClaim was not associated with any of the parties to this litigation.  Lochridge had no reason to favor Massachusetts Bay over Stateside because of VeriClaim's prior referrals.  And because McCool was the umpire whose role was to resolve disputes between the party-appointed appraisers, Lochridge could not have "sided" with McCool.  There is no basis to infer that the prior referrals resulted in partiality or an appearance of partiality that under Texas law would support disregarding the award.

### 2. Was the Award a Result of Fraud, Mistake, or Accident?

The plaintiffs argue that the appraisal award resulted from mistake or accident because "Lochridge's estimates, which were submitted to and considered by McCool, were not based upon any sound, reasonable or reliable appraisal methodology." (Docket Entry No. 34, at 17.) "A court may set aside an award on the ground of mistake [or accident] only 'upon a showing that the award does not speak the intention of the appraisers.'" *JM Walker LLC*, 356 F. App'x at 746 (quoting *Providence Wash. Ins. Co. v. Farmers Elevator Co.*, 141 S.W.2d 1024, 1026 (Tex. Civ. App.—Amarillo 1940, no writ)).  Stateside and MLCSV10 have provided no evidence that the appraisal award did not reflect McCool's intent.  To the contrary, the record is clear that, for certain

14

damages, McCool decided to use Lochridge's estimates over Haden's.  An umpire must often choose between two competing values.  McCool's decision to use Lochridge's estimates rather than Haden's does not mean that the appraisal award resulted from accident or mistake.

The plaintiffs cite *Barnes v. Western Alliance Insurance Co.*, 844 S.W.2d 264 (Tex. App.—Fort Worth 1992, writ dism'd by agr.).  In *Barnes*, the appellants—insureds under a property insurance policy—argued that there was insufficient evidence supporting the jury's determination that an appraisal award resulted from fraud, mistake, or accident.  *Id.* at 270.  At trial, the insurer presented evidence that during the appraisal process, the appellants had lied about the damage their roof sustained in a hailstorm.  The appellants' misrepresentations created "a great deal of confusion about which part of the roof . . . was actually damaged during the . . . hailstorm, so much so that the appraisers and umpire could not tell which part needed to be replaced because of the storm."  *Id.* at 270–71.  The Texas Court of Appeals concluded that the insureds' "dishonesty and the resultant confusion" were "sufficient for the jury to have reasonably concluded that the appraisal award was the result of accident or mistake."  *Id.* at 271.  In this case, there is no evidence that anyone lied to the appraisers or to the umpire during the appraisal process.  Nor is there evidence that the appraisal panel was confused as to what damage the Property sustained as a result of the hurricane and vandalism.  *Barnes* is distinguishable and provides no basis for disregarding the appraisal award.

In addition, there is no evidentiary basis to conclude that Lochridge's estimates "were not based upon any sound, reasonable or reliable appraisal methodology." (Docket Entry No. 34, at 17.)  McCool and Lochridge explained that Lochridge's estimates were based on his professional experience.  Lochridge testified extensively about that experience.  Lochridge also testified that he was competent to assess the scope and amount of loss in this case without the assistance of outside experts or consultants.  Indeed, the plaintiffs do not challenge Lochridge's qualifications or

15

experience.  Instead, they argue that Lochridge's estimates were methodologically unsound because Haden submitted expert reports to support his estimates while Lochridge did not.  An appraiser's loss valuation is not methodologically unsound simply because another appraiser submits supporting documentation, especially when there is evidence that the former appraiser was qualified to assess the loss.

### 3.    Was the Award Made Without Authority?

Stateside and MLCSV10 next argue that the appraisal panel exceeded its authority by deciding issues of coverage and causation reserved for courts.  Under Texas law, appraisers exceed their authority when they decide coverage and liability questions, but do not necessarily exceed their authority every time causation factors into their award.  Tracing the evolution of the judicial "distinction between *damage* questions for appraisers and *liability* questions for the courts," the Texas Supreme Court has reaffirmed that "limiting appraisal to damages and not liability is surely still correct."  *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 889–90 (Tex. 2009).  But whether causation is a liability question or a damages question depends on the circumstances.  For example, "when different causes are alleged for a single injury to property, causation is a liability question for the courts."  *Id.* at 892.  "Appraisers can decide the cost of repairs in this context, but if they can also decide causation there would be no liability questions left for the courts."  *Id.*  "By contrast, when different types of damage occur to different items of property, appraisers may have to decide the damage caused by each before the courts can decide liability."  *Id.*  In this context, courts can decide whether a particular type of damage is covered, "but if they can also decide the amount of damage caused by each, there would be no damage questions left for the appraisers."  *Id.*

> The same is true when the causation question involves separating loss
> due to a covered event from a property's pre-existing condition.
> Wear and tear is excluded in most property policies . . . because it

> occurs in every case.  If . . . appraisers can never allocate damages between covered and excluded perils, then appraisals can never assess hail damage unless a roof is brand new.  That would render appraisal clauses largely inoperative, a construction [courts] must avoid.

*Id.* at 892–93 (footnotes omitted).

Distinguishing between causation as a damages question and causation as a liability question is complicated by the practical reality that "appraisers must always consider causation, at least as an initial matter."  *Id.* at 893.  As the Texas Supreme Court has explained,

> [a]n appraisal is for damages caused by a specific occurrence, not every repair a home might need.  When asked to assess hail damage, appraisers look only at damage caused by hail; they do not consider leaky faucets or remodeling the kitchen.  When asked to assess damage from a fender-bender, they include dents caused by the collision but not by something else.  Any appraisal necessarily includes some causation element, because setting the "amount of loss" requires appraisers to decide between damages for which coverage is claimed from damages caused by everything else.

*Id.*  Ultimately, "whether the appraisers have gone beyond the damage questions entrusted to them will depend on the nature of the damage, the possible causes, the parties' dispute, and the structure of the appraisal award."  *Id.*

In this case, the plaintiffs argue that by failing to value certain losses or by appraising certain losses significantly below Haden's estimates, the other appraiser and umpire either failed to consider those losses or impermissibly determined that they were not caused by the covered events of Hurricane Ike or the subsequent vandalism.  The plaintiffs' responses to the summary judgment motion point to the following omitted or undervalued losses: (1) damage to Roof A; (2) damage to the ductwork connected to the vandalized rooftop HVAC units; (3) damage to Building C; and (4) "numerous other damages."  (Docket Entry No. 34, at 23.)  Each loss category is discussed below.

a.      **Damage to Roof A**

17

Contrary to the plaintiffs' argument, the record evidence reveals that McCool and Lochridge considered the claimed damage to Roof A and did not impermissibly decide causation in their appraisal award. McCool testified that other than "very minor damage to the ridge cap," there was no damage to Roof A. (McCool Dep. 49:23–24.) He explained that he was "very familiar with these types of roofing systems" and that "if they have damage to them from wind, it's visible. There would be portions of it blown off, there would be portions of it that you can see that are gone." (McCool Dep. 52:6–10.)

Haden's opinion that all of Roof A had to be replaced because Hurricane Ike had increased the moisture content does not provide a basis to conclude that McCool impermissibly determined that the moisture content was caused by something other than the hurricane. McCool emphasized that the appraisal award included all the damage to Roof A that he found. McCool and Haden disagreed about the extent of damage to Roof A, not about what caused that damage. A dispute about the extent of damage is clearly one for appraisers, not courts. *Cf. Johnson*, 290 S.W.3d at 891 ("A dispute about how many shingles were damaged and needed replacing is surely a question for the appraisers. If the parties must agree on precisely which shingles have been damaged before there can be an appraisal, appraisals would hardly be necessary.").

Similarly, there is no evidence that Lochridge impermissibly decided causation when assessing the damage to Roof A. When asked whether he found damage to Roof A, Lochridge testified that the appraisal panel found "an old roof that had moisture in it . . . . Now, some would claim that is damage, but . . . from the very first day that a roof is put on, it's damaged from wear, tear and exposure."[4]  (Lochridge Dep. 88:19–22.) Lochridge explained that he did not "find any

---

[4]  McCool shared this opinion. He testified that "[t]his type of roof will hold moisture in it, not just from a hurricane, but from virtually any rainstorm, with this age, with the approximate or apparent age that this roof appeared to be." (McCool Dep. 84:14–17.)

18

problems with the roof [attributable] to mechanical damage or hurricane damage or wind damage" other than the damage that was included in the appraisal award.  (Lochridge Dep. 88:24–89:2.) Lochridge considered the moisture test conducted by Stateside's expert, but was unable to attribute the moisture to Hurricane Ike over wear and tear because he did not find "any penetration or breaking of the [roof] membrane."  (Lochridge Dep. 99:16–17.)  He explained that "[y]ou have to penetrate the building envelope to allow moisture in it if you're going to be attributing it to storm damage.  There are other sources for moisture in a roof that don't require a penetration of the roof, but not as it relates to storm damage."  (Lochridge Dep. 100:10-15.)  Lochridge's causation evaluation involved no more than "separating loss due to a covered event from a property's pre-existing condition."  *Johnson*, 290 S.W.3d at 892.  Under Texas law, such a causation determination relates to damages and is properly addressed by the appraisers.  *See id.* at 892–93 ("If [the insurer] is correct that appraisers can never allocate damages between covered and excluded perils, then appraisals can never assess hail damage unless a roof is brand new."); *id.* at 893 ("Any appraisal necessarily includes some causation element, because setting the 'amount of loss' requires appraisers to decide between damages for which coverage is claimed from damages caused by everything else.").

### b.   Damage to the Ductwork

The record evidence supports a finding that the appraisal panel either impermissibly determined causation with respect to the damage to the ductwork connected to the rooftop HVAC units or did an incomplete appraisal.  McCool testified that he did not determine whether there was ductwork damage because he did not believe that either Hurricane Ike or the subsequent vandalism could have caused such damage.  McCool retained HB Mechanical to assess the vandalism-related damage.  Like McCool, HB Mechanical did not "go out and inspect the ductwork."  (McCool Dep.

60:16–17.)  McCool explained that he and HB Mechanical agreed that because the ductwork "is inside a building," no damage "could have occurred . . . unless the [HVAC units were] ripped off the roof and then part of the ductwork was taken with [them]."  (McCool Dep. 56:4–8.)  By contrast, Haden testified that "[t]he rooftop units have had their . . . entire shell removed" and that "literally at the base of the A/C unit is the attachment for the ductwork going right into the units."  (Haden Dep. 96:1–9.)  Haden explained that HB Mechanical "didn't pay attention to the fact that water, since the date of loss has been entering th[e] ductwork and [was] now sitting inside the ducts, inside the unoccupied spaces and that the ductwork needed to be addressed."  (Haden Dep. 96:9–13.)  He stated that "[w]hether the water came from the hurricane or the water came subsequent to the actual event of the vandalism, it still is a result of vandalism and it's part of a vandalism claim, as well as the hurricane claims."  (Haden Dep. 96:21–25.)  Haden submitted estimates from two companies for repairing the vandalism-related damage to the HVAC units.  Both estimates included costs for replacing the ductwork.  One of the estimates stated that the ductwork had to be replaced because the "damaged units" had been "leaking water into the building."  (Docket Entry No. 39-6, at 20.)

McCool and Lochridge did not conclude that there was no damage to the ductwork or that the damage to the ductwork was attributable to wear and tear.  McCool and Lochridge did not inspect the ductwork because they concluded that neither the hurricane nor vandalism could have damaged it.  Haden's testimony and the two estimate reports from A/C contractors that he submitted to the appraisal panel suggest that damage could have occurred if water leaked into the ductwork after the vandalism of the HVAC units left the ductwork exposed.  Viewed in the light most favorable to the plaintiffs, the record evidence supports a finding either that the appraisal award is incomplete because it did not include any inspection of the ductwork or that McCool and Lochridge impermissibly found no coverage by finding that no covered event caused the ductwork damage.

20

Texas courts have held that "appraisers exceed their authority when they engage in making the legal determination of what is or is not a covered loss based on their determination of what caused the loss or a portion of it." *Lundstrom*, 192 S.W.3d at 89.

### c.    Damage to Building C

The response to the summary judgment motion does not identify the particular damage to Building C that the plaintiffs contend the appraisal panel failed to value or undervalued.  In his deposition, Haden testified that he disagreed with the appraisal award only in three areas:  the damage to Roof A, the damage to the HVAC units and related ductwork, and the CMU block damage.  It appears that the CMU block damage is the relevant damage to Building C.

The record evidence does not provide a basis for finding a disputed fact issue material to determining whether Lochridge and McCool impermissibly determined coverage and causation with respect to the CMU block damage.  Haden testified that the appraisal panel "agreed that there was damage to the CMU block" but "did not agree as to the full extent of damage, nor necessarily the repair methodology." (Haden Dep. 81:6–8.)  Haden "was . . . of the opinion that a larger portion of the CMU block needed to be removed and reconstructed in order to put . . . the property back to the condition it was [in] prior to the loss." (Haden Dep. 81:11–14.)  Lochridge and McCool "said it wasn't that quantity." (Haden Dep. 81:15–16.)  Haden's testimony clearly shows that the appraisal panel agreed that Hurricane Ike caused the CMU block damage but disagreed on the extent of the damage.  Lochridge and McCool concluded that the damage was less than what Haden thought it was.  The appraisal award reflects Lochridge's and McCool's damage valuation.  Appraisers do not exceed their authority by such a determination.

### d.    "Numerous Other Damages"

Stateside and MLCSV10 also argue that the appraisal panel exceeded its authority by failing to value or by undervaluing "numerous other damages." The responses to the summary judgment motion do not identify the "numerous other damages" and do not articulate how the appraisal panel exceeded its authority in relation to this category. The responses merely cite to a 13-page, single-spaced affidavit that Haden prepared after his deposition. The affidavit describes in detail Haden's disagreements with the appraisal award.

The Federal Rules of Civil Procedure require "[a] party asserting that a fact . . . is genuinely disputed" to "support the assertion by . . . citing to *particular parts* of materials in the record" and by "*showing* that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c)(1) (emphasis added). A general citation to a lengthy affidavit—without identifying any particular part of the affidavit and articulating how it precludes summary judgment—is insufficient to create a disputed fact issue when the moving party has satisfied its initial burden under Rule 56(c).[5]

The affidavit also raises a separate problem. The defendants objected to the affidavit. One objection is that to the extent the affidavit identifies disagreements with the appraisal award that Haden did not identify at his deposition, it is not competent summary judgment evidence because it directly contradicts the sworn deposition testimony that Haden only disagreed with three specific parts of the award, without explaining the conflict. MLCSV10 responds that Haden's affidavit does not conflict with the deposition, but instead provides additional detail to the appraisal-award disagreements Haden identified at his deposition.

---

[5] MLCSV10 first identified particular parts of Haden's affidavit that it asserted showed that the appraisal panel exceeded its authority at oral argument. To consider these arguments at this stage, months after the summary judgment motion briefing was completed, would be unfair to the defendants, who have not had an adequate opportunity to respond.

At his deposition, Haden testified that the *only* disputes he had with the appraisal award related to the HVAC ductwork damage, the CMU block damage, and the damage to Roof A. (Haden Dep. 99:13–100:1, 102:5–25, 120:6–12.)  In his affidavit, Haden clearly added more areas of disagreement and dispute than the three he testified to in his deposition.  For example, in his affidavit, Haden criticized the appraisal award for omitting costs to repair damage to the roofs of Buildings B and E, to waterproof Building C, and to complete electrical work associated with repairs to Building D.  (Docket Entry No. 38-3, at 5.)  By identifying additional disputes with the appraisal award, Haden's affidavit contradicted his deposition testimony specifically and repeatedly stating that the only disputes he had with the appraisal award were the three he identified.  Courts, including in the Fifth Circuit, have held that affidavits that contradict earlier deposition testimony do not create a genuine issue of material fact without adequate explanation for the contradiction.  *See, e.g., EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 268–69 (3d Cir. 2010); *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000).

Neither Haden's affidavit nor MLCSV10's briefing adequately explains the contradiction between Haden's affidavit and his deposition testimony.  MLCSV10 argues that there is no contradiction because the affidavit provides additional detail to the appraisal-award disagreements Haden identified at his deposition.  (Docket Entry No. 48, at 2–3.)  But, as discussed above, Haden's affidavit did not merely add additional detail to the three identified categories of loss.  The affidavit added new categories of loss that, according to Haden, the appraisal award omitted, such as the costs to repair damage to the roofs of Buildings B and E, to waterproof Building C, and to complete electrical work associated with repairs to Building D.  To the extent Haden's affidavit directly contradicts his prior deposition testimony by adding new areas of disagreement with the award, without explanation, the affidavit is properly disregarded.  To the extent Haden's affidavit provides

additional detail to the earlier-identified disagreements, the affidavit is competent summary judgment evidence, but it does not raise a fact issue material to determining whether the appraisal award should be disregarded based on the award's failure to account for "numerous other damages." Haden's affidavit does not challenge the undisputed record evidence that McCool did not find additional damage to Roof A other than the damage listed in the appraisal award, or that the disagreement between Haden on the one hand and Lochridge and McCool on the other as to the CMU block damage related to the extent of the damage.

### 4.    Is There a Basis for Setting Aside the Entire Appraisal Award?

The summary judgment record does not support a finding that the appraisal award was not in compliance with the Policy because Lochridge and McCool were or appeared partial nor that the award resulted from accident or mistake.  To the extent the appraisal award implicitly determined that the ductwork damage was not covered under the Policy, the plaintiffs have provided a sufficient basis for setting aside that part of the appraisal award.  There is, however, no basis for setting aside the entire award or any other part of it.[6]

The defendants argue that MLCSV10 may not challenge the appraisal award because its original complaint did not assert a cause of action for vacating the award.  (Docket Entry No. 42, at 10.)  In response, MLCSV10 moves for leave to file an amended complaint.  (Docket Entry No. 46.)  The defendants' argument is unpersuasive.  When MLCSV10 filed its original complaint, the appraisal process was ongoing; MLCSV10 could not have asserted a cause of action for vacating a nonexistent appraisal award.  Second, the defendants moved for summary judgment on the basis that the appraisal award was binding and enforceable.  MLCSV10 is entitled to respond to this

---

[6] Of course, a finding that appraisers were biased would require setting aside the entire award.  But as all parties admitted at oral argument, there is no precedent that compels setting aside an entire appraisal award based on a finding that one part of the award was incomplete or implicitly determined a coverage issue.

argument. *See Franco*, 154 S.W.3d at 785 n.7 (holding that the appellants were "not barred from raising the issue of the appraisal award's validity for the first time in their summary judgment response" despite "not having alleged a cause of action to set aside the award" in their petition). To the extent that pleading the grounds for disregarding an appraisal award is a prerequisite to challenging the award, this court grants MLCSV10's motion for leave to amend.

### B.    The Breach of Contract Claim

Massachusetts Bay argues that it is entitled to summary judgment on MLCSV10's breach of contract claim because it tendered full payment under the appraisal award. Massachusetts Bay's argument is premised on the completeness of the appraisal award. As discussed above, the record evidence supports a finding that one part of the appraisal award was incomplete because it did not value the damage to the ductwork connected to the rooftop HVAC units. Because Massachusetts Bay did not tender payment under a complete appraisal award, it is not entitled to summary judgment on the breach of contract claim.

The three Hanover defendants contend that they are entitled to summary judgment on MLCSV10's breach of contract claim because "they were not parties to the insurance contract." (Docket Entry No. 33-1, at 20.) They point to the Policy, which lists Massachusetts Bay as the insurance provider. The Hanover defendants have met their initial Rule 56(c) burden. MLCSV10 must point to some evidence showing the existence of an insurance contract between the Hanover defendants and Stateside. MLCSV10 has not done so and has not responded to the Hanover defendants' argument. The Hanover defendants' motion for summary judgment is granted.

### C.    The Extracontractual Claims

Massachusetts Bay's argument for summary judgment on Stateside's extracontractual claims is based on its argument that there is no breach of contract. Because, as discussed above,

25

Massachusetts Bay is not entitled to summary judgment on the breach of contract claim at this stage, it is also not entitled to summary judgment on the extracontractual claims on the ground that there is no breach of contract.[7]

## IV.    Conclusion

For the reasons discussed above, Massachusetts Bay's motion for summary judgment on MLCSV10's breach of contract claim and Stateside's extracontractual claims is denied.  The Hanover defendants' motion for summary judgment on the breach of contract claim is granted.  A status conference to set a schedule to resolve the remaining claims is set for **April 16, 2012 at 5:00 p.m.**

SIGNED on March 30, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

[7]  In light of this ruling, there is no need to address Stateside's argument that the summary judgment motion should be denied because Stateside has not had a sufficient opportunity to conduct discovery on the extracontractual claims.